Nos. 25-3347, 25-3348, 25-3349, 25-3350 & 25-3363

————————

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

————————

CRYSTALLEX INTERNATIONAL CORPORATION

v.

BOLIVARIAN REPUBLIC OF VENEZUELA

Bolivarian Republic of Venezuela, Appellant in No. 25-3347
PDV Holding, Inc., Appellant in No. 25-3348
CITGO Petroleum Corporation, Appellant in No. 25-3349
Petróleos de Venezuela, S.A., Appellant in No. 25-3350
Gold Reserve Ltd., Appellant in No. 25-3363

————————

On Appeals of an Order of the
United States District Court for the District of Delaware
No. 17-mc-151-LPS (Hon. Leonard P. Stark)

————————

**STATEMENT OF APPELLANT GOLD RESERVE LTD.
IN SUPPORT OF A STAY PENDING APPEAL**

————————

MATTHEW H. KIRTLAND
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street NW, Suite 1000
Washington, DC 20001
(202) 662-0200

AARON M. PANNER
DANIEL S. SEVERSON
COLLIN R. WHITE
DENNIS D. HOWE
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7921

*Counsel for Appellant Gold Reserve Ltd.*

December 8, 2025

*(Additional Counsel Listed Inside)*

KEVIN J. MANGAN
MATTHEW P. WARD
STEPHANIE SMIERTKA RILEY
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
(302) 252-4320

MICHAEL BOWE
TYLER PURINTON
BRITHEM LLP
565 Fifth Avenue
New York, NY 10017
(646) 653-9173

*Counsel for Appellant
Gold Reserve Ltd.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure, Gold Reserve Ltd. states that it does not have a parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

**TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................................... i

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION ............................................................................ 1

BACKGROUND ............................................................................. 2

REASONS FOR GRANTING THE STAY ....................................................... 9

I.    GOLD RESERVE IS LIKELY TO SUCCEED ON THE MERITS OF ITS APPEAL .......................................................... 9

    A.    Disqualification of the District Court, the Special Master, and Advisors Weil and Evercore Is Required Under Section 455 ......................................................... 9

        1.    Weil's and Evercore's Conflicts of Interest Create the Appearance of Bias Under Section 455 ............................... 10

        2.    Weil's and Evercore's Conflicts of Interest Are Imputed to the Special Master and the District Court ............................................................... 14

    B.    The District Court's Sale Order Is Unlawful ....................................... 15

        1.    The Sale Order Violates Section 324's Requirement That the PDVH Shares Be Sold to the Highest Bidder ................................................ 16

        2.    The Claimed Justification for the Lower-Priced Elliott/Amber Bid Is Speculative and Without Record Support ......................................... 18

II.   A STAY IS NECESSARY TO PREVENT IRREPARABLE HARM AND TO PROTECT THE PUBLIC INTEREST ......................... 20

CONCLUSION ............................................................................. 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF BAR MEMBERSHIP

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155 (3d Cir. 1993) .......................... 14

*Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145
(1968) ...................................................................................................9-10

*Del Monte Foods Co. S'holders Litig., In re*, 25 A.3d 813
(Del. Ch. 2011) ........................................................................................20

*Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022 (Del. Ch. 2004)................................21

*Kensington Int'l Ltd., In re*, 368 F.3d 289 (3d Cir. 2004)........................10, 11, 14, 15

*Liljeberg v. Health Servs. Acq. Corp.*, 486 U.S. 847 (1988)..................................... 10

*Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236 (3d Cir. 2011)...................22

*Revel AC, Inc., In re*, 802 F.3d 558 (3d Cir. 2015)......................................................9

*Roche v. Evaporated Milk Ass'n*, 319 U.S. 21 (1943).................................................. 15

*School Asbestos Litig., In re*, 977 F.2d 764 (3d Cir. 1992).................................. 10, 15

*Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223
(3d Cir. 2011)..............................................................................................9

**STATUTES**

28 U.S.C. § 455 ..............................................................................................9, 10

28 U.S.C. § 455(a)......................................................................................9, 10, 14

Del. Code tit. 8:

§ 324.......................................................................................................16, 17

§ 324(a) ...............................................................................................3, 9, 16

**INTRODUCTION**

The district court's final sale order is procedurally and substantively defective, and a stay pending appeal is warranted. On that, Gold Reserve and the Venezuela Parties agree. The district court, acting on the conflict-tainted recommendation of a special master, approved a bid that delivers more than $2 billion *less* to judgment creditors than the highest-priced bid (which Gold Reserve had submitted). That erroneous judgment should be vacated, as Gold Reserve will argue in due course. But, contrary to the position of the Venezuela Parties, there is no basis to interfere with this Court's prior rulings that the attachment of Petróleos de Venezuela, S.A.'s ("PDVSA") shares in PDV Holding Inc. ("PDVH") is valid.

As matters stand, the district court has ordered Elliott not to close any sale until seven days after the Special Master informs the court that Elliott has obtained all required regulatory approvals and is ready to close. That could happen at any time; absent a stay, the parties will need to file motions on an emergency basis, and this Court will face the burden of addressing them. By contrast, if a stay is entered, this Court can decide these appeals—which the parties can agree to expedite—on a timeline that will not interfere with any closing. Accordingly, the equities are unusually one-sided in favor of a stay.

## BACKGROUND

1.  Plaintiff Crystallex International Corporation ("Crystallex") holds a $1.2 billion judgment against Venezuela based on Venezuela's expropriation of the company's gold mining rights.  (D.I.1.)[1]  In the proceedings below, Crystallex sought to collect on its judgment by executing on property nominally owned by Venezuela's state-owned oil company, PDVSA—namely, PDVSA's shares of its wholly owned U.S. subsidiary, PDVH, which in turn indirectly owns CITGO Petroleum Corp. ("CITGO").  In August 2018, the district court found that PDVSA was an alter ego of Venezuela and that PDVSA's shares in PDVH were subject to attachment by Venezuela's judgment creditors.  (D.I.78, 79.)

On April 13, 2021, the court appointed Special Master Robert B. Pincus to oversee the sale of PDVH shares.  The Special Master retained Weil, Gotshal & Manges LLP ("Weil") as transaction counsel and Evercore, Inc. ("Evercore"; together with Weil, "Advisors") as financial advisor; both were granted judicial immunity.  (D.I.277 (¶¶ 13, 21; D.I.560-1.)

During this period, there was parallel litigation involving the validity of bonds issued by PDVSA in 2020 and a pledge of 50.1% of PDVH's equity.  *See Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, No. 1:19-cv-10023

---

[1] "D.I." references the district court's docket entries; "Dkt." references this Court's docket entries in No. 25-3091 (prior mandamus proceedings); and "A___" references the sealed volume of the appendix in No. 25-3091 (Dkt.5).

(S.D.N.Y.). The Venezuelan opposition government recognized by the United States takes the position in that litigation that the bonds are invalid under Venezuelan law; the United States has stated that Venezuela's interpretation of its own laws is entitled to "respectful consideration." (D.I.2183-2.) Even if the 2020 bonds are valid, U.S. sanctions bar their enforcement. (D.I.2183; D.I.2183-2 at 2; *see also* D.I.1741 at 7-8.) An appeal over the 2020 Bondholders' claims is pending in the Second Circuit; regardless of its outcome, the 2020 Bondholders are not judgment creditors eligible for relief in this action under Delaware law.

2.      The initial bidding process for the PDVH shares took place in June 2024, at which point (as today) Gold Reserve submitted the highest-priced bid. (D.I.1359-1 at 2.) Under Delaware law, the district court must sell the PDVH shares "to the highest bidder," Del. Code tit. 8, § 324(a), but the Special Master recommended a bid by Elliott Investment Management, L.P. ("Elliott"), one of the world's largest restructuring and distressed asset investment firms and (as later would be revealed) a significant client of both Weil and Evercore. The prior recommended Elliott bid was lower than Gold Reserve's bid, ignored the court-approved priority for satisfying attached judgments, and significantly favored the 2020 Bondholders over party judgment creditors by providing for escrows of substantial amounts of the purchase price to potentially pay out to the 2020 Bondholders.

3

Every other interested party protested the prior Elliott recommendation. (D.I.1373-5 at 1-4; D.I.1373-6 at 3.)  As a result, the district court ordered the Special Master and potential bidders to conduct a new sale process with reformed procedures.  (D.I.1517 at 1-8.)  Once again, the Special Master initially selected a bid (from a 2020 Bondholder) that was lower than Gold Reserve's but provided for payment of the 2020 Bondholders to the detriment of the judgment creditors. (D.I.1741.)  At the close of the subsequent "Topping Period," Gold Reserve improved its bid to $7.382 billion, and the Special Master ultimately entered into a stock purchase agreement ("SPA") with Gold Reserve's bidding entity, Dalinar Energy.  (D.I.1837 at 1-2, 28-29 (¶¶ 75-76, 78); D.I.1837-1 at PDF pp. 51-148.)

Meanwhile, during the same Topping Period, Weil communicated *ex parte* with its client Elliott about Elliott's desire to submit a topping bid and its difficulty in preparing one in time.  Rather than encourage Elliott to submit its best bid under the reformed procedures (as Gold Reserve had done), Weil strategized with Elliott that it would be better for Elliott to submit an "unsolicited" bid after the Final Recommendation was made, giving Elliott the benefit of seeing the recommended bid.  (A2428.)  Among other things, they discussed how this would save Elliott "some money in commitment fees."  (*Id.*)  These conversations with Weil occurred after the head of Weil's Restructuring Department, who was not otherwise involved in the sale proceedings, fielded a call from a senior Elliott representative

4

and subsequently connected him with the Weil team advising the Special Master, to whom he conveyed that he would "hate for [Elliott] to not want to work with us." (A2328; A2513-14.)

Consistent with this back-channeling, Elliott submitted a purported unsolicited bid in early August 2025 that was approximately $1.5 billion lower than Gold Reserve's final recommended bid, but again guaranteed payment of more than $2.1 billion to the non-judgment creditor 2020 Bondholders at the judgment creditors' expense. (D.I.2123 at 2, 4-6 (¶¶ 4, 7, 9).) On August 25, 2025, the Special Master designated Elliott's bid as a Superior Proposal and, under the terms of the SPA, Gold Reserve had just three days to improve its own proposal in response. (D.I.2113 at 2.) With enormous effort, Gold Reserve submitted a new bid priced at $7.902 billion, which was more than $2 billion higher than Elliott's bid and would have satisfied more judgments than any conforming bid submitted in the process. (D.I.2123 at 3, 8-10 (¶¶ 5, 13-15).)

To no avail. On August 29, 2025, the Special Master issued his Updated Final Recommendation recommending that the Court authorize and approve the sale of PDVH shares to Elliott. The singular feature cited by the Special Master as favoring the Elliott bid was its agreement to pay off the 2020 Bondholders for their still-contingent claims. (A798.) The district court had previously stated that a settlement with the 2020 Bondholders was ***not*** a required component of a bid to be

recommended. (D.I.1517 at 7 (¶ 28).) Yet the Special Master explained that the "[m]ost significant[ ]" aspect of the Elliott proposal was that it "virtually eliminates any closing risks associated with" the 2020 Bondholders litigation "by delivering a settlement with the PDVSA 2020 Bondholders," such that the transaction "can close regardless of the outcome." (D.I.2123 at 10 (¶ 16).) Gold Reserve had provided a 29-page detailed analysis demonstrating that the 2020 Bondholders posed no risk to the closing of Gold Reserve's bid. But in an *ex parte* communication with the district court, Weil dismissed and criticized that analysis without providing or even having conducted any analysis of its own. (D.I.1840-1 at 51:19-52:13.) (describing a Gold Reserve legal memorandum as having "limited value").

3.  Throughout the sale process, the Advisors have been in control. Over just the past 14 months, the Special Master himself claimed a total of just over $700,000 ($713,191.83) in fees and expenses. (D.I.1360 at 4; D.I.1404 at 3; D.I.1430 at 5; D.I.1584 at 5; D.I.1742 at PDF p. 5; D.I.1800 at 4; D.I.1965 at 6; D.I.2355 at 6.) That amount is less than one average month's bill from Weil and Evercore, which collectively claimed more than $39 million in fees and expenses over the same period. (*Id.*) Meanwhile, the district court largely deferred to the Special Master and his Advisors, explaining at a recent *ex parte* conference with the Special Master and Advisors that the court had been "dealing with other

6

things," had "no insight into what [the Special Master is] doing day-to-day, and what the status of the bids are." (D.I.1840-1 at 19:7-20:8.)

At the time of the Advisors' appointment and for the vast majority of the sale process, Gold Reserve and other judgment creditors had no reason to suspect that Weil's and Evercore's relationships with Elliott and the 2020 Bondholders were more than de minimis. At the September 9, 2025, deposition of Elliott's assistant general counsel, however, Gold Reserve learned for the first time that Weil has served and continues to serve as Elliott's outside counsel in various matters, including in connection with trading, credit, and restructuring issues. (A2252-53.) After Gold Reserve raised these conflicts of interest with the district court on September 10, the court ordered a response from the Special Master and his Advisors. (A2269.) Their subsequent disclosures revealed that Weil collected more than $4.6 million in fees from Elliott and its affiliates from 2023-2025, spanning 16 different matters. (D.I.2474-4; A2266-67.) More significant, disclosure also revealed that, since the Special Master retained Weil in 2021, Weil has earned more than $62 million in fees from the 2020 Bondholders whose interests the Advisors have made a priority since 2024, when the bidding process began. (D.I.2474-8.) Weil also has earned $12.8 million more from ad hoc groups including one or more Bondholders. (*Id.* & n.1.)

For its part, Evercore has earned substantial fees from ad hoc groups involving Elliott and will obtain more for collaborations with Elliott on other matters. (A2259-61; A2276 n.2; A2485-86.) During the period in which it has been an Advisor to the Special Master, Evercore has earned more than $80 million directly or through ad hoc groups involving the 2020 Bondholders. (A2485-87.) All told, Weil and Evercore have received a combined $170 million in fees from engagements of Elliott and the 2020 Bondholders during just the last four years of these sale proceedings.

4.    Gold Reserve moved to disqualify the Advisors, the Special Master, and the court; the Venezuela parties also filed a motion. (D.I.2381, 2385.) On November 13, 2025, the court denied the disqualification motions. (D.I.2526.) On November 25, the court issued its opinion adopting the Special Master's Updated Final Recommendation (D.I.2553, 2554); on November 29, it issued the sale order approving the sale to Elliott (D.I.2556). The court denied Gold Reserve's request for a stay pending appeal, but it stayed the transaction's closing until seven days after notification that necessary approvals have been obtained and that Elliott is ready to close. (D.I.2553 at 161-62.) Elliott could obtain those approvals and provide this notification at any time.

**REASONS FOR GRANTING THE STAY**

Courts consider four factors to evaluate a request for a stay pending appeal: "(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (cleaned up).  Gold Reserve satisfies each of those factors.

## I.   GOLD RESERVE IS LIKELY TO SUCCEED ON THE MERITS OF ITS APPEAL

A likelihood of success is a "reasonable chance" of prevailing.  *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). Gold Reserve has a "reasonable chance" of prevailing on at least two of its appellate arguments:  that (1) disqualification of the district court, the Special Master, and his Advisors is required under 28 U.S.C. § 455; and (2) the district court's sale order violates Delaware Code title 8, § 324(a).

### A.   Disqualification of the District Court, the Special Master, and Advisors Weil and Evercore Is Required Under Section 455

Under 28 U.S.C. § 455(a), disqualification is required whenever a judge's "impartiality might reasonably be questioned."  "[A]ny tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias."  *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393

9

U.S. 145, 150 (1968); *see also In re Kensington Int'l Ltd.*, 368 F.3d 289, 317-18 (3d Cir. 2004). Whenever circumstances create an appearance of bias, disqualification is mandatory, because the court has "no statutory power to hear" the case. *In re School Asbestos Litig.*, 977 F.2d 764, 778 (3d Cir. 1992); *see also* 28 U.S.C. § 455(a); *Liljeberg v. Health Servs. Acq. Corp.*, 486 U.S. 847, 859-61 (1988).

Disqualification is required here because: (1) Weil's and Evercore's lucrative relationships with Elliott and the 2020 Bondholders create an appearance of bias under Section 455(a); and (2) those conflicts are imputed to the Special Master and the district court under this Court's analysis in *Kensington*.

### 1. Weil's and Evercore's Conflicts of Interest Create the Appearance of Bias Under Section 455

Circumstances give rise to an appearance of bias that requires disqualification under Section 455 when an average layperson, fully informed of the facts, would find the adjudicator's objectivity to be reasonably questionable. *See Kensington*, 368 F.3d at 301-03. That is the case here. At minimum, a reasonable observer would question Weil's independence based on its ongoing yet undisclosed attorney-client relationship with Elliott at the same time as it was purporting to act as a fair and impartial evaluator of Elliott's competing bid would cause. The same is true for Weil's representations of the 2020 Bondholders and Evercore's commercial relationship with both parties.

10

*First*, a reasonable observer would question whether an attorney or banker would ignore the potential benefit to an existing client from the outcome of a separate case—the very consideration that led to disqualification in *Kensington*. In that case, this Court held that the district judge's attorney advisors in one asbestos case were conflicted because they also represented plaintiffs in an "unrelated asbestos-driven bankruptcy." *Id.* at 302. "By their very position as representatives of the future asbestos claimants" in the unrelated bankruptcy, the advisors "signaled to all that they could not be non-partisan, benign, or neutral" in the proceedings before the district court. *Id.* at 304. Just as the advisors in *Kensington* had an incentive to tilt their advice to the district court to benefit clients in an unrelated proceeding, so too Weil and Evercore have an incentive to prefer an outcome favorable to their own clients.

The district court tried to distinguish *Kensington* on the ground that the two asbestos cases "involved overlapping legal issues," while there is "no overlapping issue between this case and the unrelated matters in which Weil and Evercore have represented Elliott, the 2020s, and/or their respective affiliates." (D.I.2526 at 39.) But *Kensington* turned on the fact that the advisors held mutually incompatible "dual roles" that gave rise to a conflict of interest (*see* 368 F.3d at 304-05)—not on the legal (rather than business) nature of that conflict.

11

*Second*, a reasonable observer naturally would wonder how the recommendation in this proceeding will affect the Advisors' own economic *self-interest*. The Advisors have been paid more than $170 million in other matters by the proponent (Elliott) and beneficiaries (the 2020 Bondholders) of the bid that the Special Master and his Advisors have recommended. A reasonable observer would ask whether, by favoring the interests of those clients, Weil and Evercore hope to encourage those clients to view them favorably—and steer more business their way.

The appearance problems here are exacerbated by the fact that Weil partners urged the Advisors to "speak" with Elliott to avoid the risk that Elliott would "not want to work with" Weil in the future. (D.I.2526 at 30.) The district court dismissed this communication because subsequent discussions that the Weil Advisors had with Elliott did not provide Elliott any information "other than what Elliott could discern for itself." (*Id.* at 31.) But this misses the point: Elliott had, and took advantage of, an inside track to ensure that the Advisors were responsive. A reasonable observer would recognize that the Advisors similarly had an incentive to favor the interests of their client in the sale process.

The district court also noted that the fees Weil received from Elliott and the 2020 Bondholders were "immaterial compared to Weil's $4.5 billion revenue during that same period" and that the fees received by Evercore were "dwarfed by Evercore's annual revenue, which in 2024 was $2.97 billion." (*Id.* at 38.) But an

12

ordinary observer would not discount these amounts as "immaterial." A financial interest need not be large to undermine the appearance of impartiality required of judicial proceedings. And the financial interests here *were* substantial. Millions—to say nothing of $170 million—in revenue is a material amount to any law firm or investment bank.

*Third*, the district court stated that "[f]irms qualified to provide the Special Master competent advice typically have regular interactions with the types of entities who may be interested in buying an asset like the PDVH Shares." (D.I.2526 at 27.) But no case supports overlooking an appearance of partiality on the ground that it is difficult to find unconflicted advisors. Nor would such an exception make sense: the sale process is a judicial proceeding, not a private transaction, and the parties that are subject to the power of the court are entitled to decision-makers who are free of an appearance of bias. As a practical matter, it is hard to swallow the assertion— which was not backed by evidence—that there are no law firms or investment banks that were both free of conflicts and capable of advising the Special Master. And even if the district court's premise were correct, that would underscore the importance of full *disclosures* to permit parties to the proceeding to make a knowing waiver in advance, disclosures that were not made here.[2]

---

[2] Gold Reserve's disqualification motion was timely. Gold Reserve first learned of Weil's extensive ongoing relationships with Elliott at the September 9 deposition of Elliott's representative; Gold Reserve sought discovery the next day

### 2. Weil's and Evercore's Conflicts of Interest Are Imputed to the Special Master and the District Court

Under *Kensington*, conflicts of interest of advisors like Weil and Evercore extend to the adjudicators who consult with them and require disqualification of those adjudicators even if they are not otherwise conflicted. "[W]here, as here, [an adjudicator] surrounds himself with individuals who may not be truly disinterested," "there is an almost irrebuttable presumption that a judge is 'tainted' and must be disqualified." *Kensington*, 368 F.3d at 308. Those principles require disqualification of the Special Master and the district court.

"For purposes of § 455(a) disqualification, it does not matter whether the district court judge [or Special Master] actually harbors any bias against" Gold Reserve or toward Elliott or the non-judgment creditors who stand to benefit from the Special Master's recommendation. *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 162 (3d Cir. 1993). In *Kensington*, this Court repeatedly emphasized that the district judge—who had consulted with advisors who themselves had conflicts of interest—had not "done anything wrong or unethical or biased." 368 F.3d at 294. Nevertheless, the advisors' conflict was imputed to the judge and required his disqualification. Indeed, Section 455(a) "reflects Congress's view that the adjudication of a case by a judge with an actual *or* apparent bias is an 'abuse of

---

and filed its motion within a month. (D.I.2381.) Weil's prior disclosure of a single engagement for Elliott lasting less than one month that ended in August 2024 was affirmatively misleading and concealed the scale of the conflict.

judicial power' . . . [and] a threat to the integrity of the judicial system." *School Asbestos*, 977 F.2d at 778 (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 31 (1943)).

In *Kensington*, this Court found that advisors' conflicts of interest required disqualification of the district judge given "the importance of the Advisors' role" and their "unique level of influence," which created an impermissible appearance of bias. 368 F.3d at 304. Disqualification was required even though the judge had "met with the Advisors as a group on only four occasions for a total of eighteen hours," after which the advisors "became functionally obsolete." *Id*. at 306. Here, Weil's and Evercore's impact on the sale process has been far more pervasive. (*See* Dkt.1-3, at 12.)

*Kensington* did not involve a special master, but that distinction makes no difference. The Special Master's Advisors also have interacted directly with the district court, both in public proceedings, where the Advisors speak for the Special Master, and in at least 11 *ex parte* meetings and communications, where the Advisors appear heavily involved in decision-making. *Cf. Kensington*, 368 F.3d at 309.

## B.　The District Court's Sale Order Is Unlawful

Apart from blessing a tainted process, the district court also reached a substantively impermissible outcome. By approving the sale to Elliott for a price more than $2 billion lower than Gold Reserve's bid, the court disregarded the

15

unambiguous requirement of Delaware law that the PDVH shares be sold to the highest bidder. The court's purported justification for that result—that the risk posed by the 2020 Bondholders required a $2 billion transfer from the judgment creditors—lacks any foundation in record evidence and contradicts the record in numerous respects.

### 1.      The Sale Order Violates Section 324's Requirement That the PDVH Shares Be Sold to the Highest Bidder

Delaware law requires that, once attached, corporate shares must be sold "at public sale to the highest bidder." Del. Code tit. 8, § 324(a). This statutory requirement is absolute and unqualified. Given that Elliott's bid is $2 billion lower in purchase price than Gold Reserve's bid (*see* D.I.2501 at 587:11-588:3 (W. Hiltz)), the district court's order directing the sale of the PDVH shares to Elliott violates Delaware law.

Neither the district court, nor the Special Master, nor any party has cited a single case where, in a Section 324 sale, corporate shares have been sold to any person other than the highest bidder. In the absence of such authority, it is irrelevant that the court considered the Elliott bid "superior" because it diverts $2 billion from the Attached Judgment Creditors to try to settle with the 2020 Bondholders. Under Delaware law, there is no room for the exercise of discretion when the Court is evaluating two conforming bids from two qualified bidders. In

that scenario, Section 324 commands that the shares must be sold to the "highest bidder."

Section 324's "highest bidder" requirement does not mean that the district court cannot set criteria for defining what bidders are "qualified" and what bids are "conforming." That can be done and has been done here. And, through such mechanisms, the district court may refuse to consider bids that purport to have a higher purchase price but, in fact, are non-actionable. Indeed, the court applied that principle in these proceedings to disregard multiple, non-actionable bids. (*E.g.*, D.I.1837 at 20-23 ("Non-Conforming Bids").)

This principle has no application to Gold Reserve's bid, however. The record evidence confirms both that Gold Reserve is a qualified bidder and that its bid was conforming and actionable. (*Id.* at 23 (¶ 67).) Indeed, the Special Master himself selected Gold Reserve's bid as the "final recommended" bid before later deviating to Elliott's eleventh-hour submission. In attempting to square its decision with Delaware law, the district court asserted that Gold Reserve's bid was "no longer" qualified based on a footnoted comment in Gold Reserve's post-hearing briefing that " 'the Court's decision to grant the Special Master's request to terminate the Dalinar Energy SPA . . . has caused dislocation with [Dalinar's] lending consortium.' " D.I.2553 at 144, 146 (quoting D.I.2433 at 16 n.8) (alterations by court). But that is circular: the "dislocation" occurred because of

17

the district court's decision to terminate Gold Reserve's purchase agreement and adopt Elliott's. The court cannot claim the consequences of its own making as a justification for disregarding Delaware law.

### 2. The Claimed Justification for the Lower-Priced Elliott/Amber Bid Is Speculative and Without Record Support

The district court's contrary decision rests on the premise that the materially lower-priced Elliott bid purports to settle the contingent risk that the 2020 Bondholders *might* attempt to interfere with the Gold Reserve financing and therefore *might* be able to prevent Gold Reserve from closing. But, even were it permissible under Delaware law to rely upon a contingent risk like the 2020 Bondholders to justify selling the PDVH shares to anyone other than the "highest bidder" (which it is not), the nature and extent of this risk still must be proven by evidence.

There is no record evidence in this proceeding to substantiate the risk from the 2020 Bondholders. No witness representing the 2020 Bondholders testified. No witness testified that the 2020 Bondholders would, in fact, seek any injunctive relief against the Gold Reserve bid or otherwise attempt to interfere with closing the Gold Reserve bid. No witness testified regarding any analysis of the 2020 Bondholders risk. Indeed, no witness testified regarding the terms of the Pledge Agreement, the Indenture, or the 2020 bonds, despite these documents being the

18

entire basis for the purported 2020 Bondholders risk. Without such testimony, there was no evidentiary basis for the district court's determination that the risk posed by the 2020 Bondholders justifies the $2 billion purchase price decrement that would result from the Elliott bid.

The validity of the 2020 bonds remains subject to legal dispute. The district court's opinion treated Judge Failla's summary judgment ruling as dispositive. (*See* D.I.2553 at 153 ("In essence, Gold Reserve and [Elliott] took opposite sides of a bet that could only pay off for one of them. In the end, [Elliott's] number came up and Gold Reserve's did not.").) But that ruling is on appeal to the Second Circuit, which reversed the district court before.

In the prior appeal, the Second Circuit ruled that Venezuelan law governs the validity of the 2020 notes; the Venezuelan opposition government recognized by the United States long has argued that, under Venezuelan law, the 2020 notes and purported Pledge are invalid; and the U.S. government twice has supported that interpretation, including in its recent Statement of Interest in SDNY. (D.I.2183-2 at 2-3 (Statement of Interest).) That support increases the likelihood that the Second Circuit again will reverse Judge Failla's ruling in favor of the 2020 Bondholders and that the supposed contingent "litigation risk" to Gold Reserve's financing will disappear. As the district court previously explained, if these proceedings result in a ruling that "the 2020 Bondholders have no rights to

19

CIT[G]O Holding," then "it would be a fundamental injustice" to execute on a lower-priced bid "when bids with a much greater purchase price were rejected." (D.I.1741 at 7-8.)

Even if the 2020 Bondholders were to prevail, they *still* would present no actual risk to the Gold Reserve financing unless the U.S. Office of Foreign Asset Control were to change its policy and lift the long-running suspension of the 2020 Bondholders' ability to exercise their purported rights under the Pledge.  But over the last six years, the U.S. government consistently has prevented the 2020 Bondholders from exercising any rights under the Pledge.  (*E.g.*, D.I.2366 at 19 n.7.)  At present, there is no evidence that the U.S. government will reverse this long-standing policy and permit the financial supporters of the Maduro regime, i.e., the 2020 Bondholders, to exercise their purported Pledge.  That absence is fatal to the district court's unsupported decision to approve a $2 billion diversion from the Attached Judgment Creditors to the 2020 Bondholders.

## II.   A STAY IS NECESSARY TO PREVENT IRREPARABLE HARM AND TO PROTECT THE PUBLIC INTEREST

Gold Reserve will suffer irreparable harm absent a stay because the transaction, once closed, will be difficult if not impossible to undo.  Many cases explain that "[t]he threatened foreclosure of" a transaction representing a "unique opportunity constitutes irreparable injury."  *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 838 (Del. Ch. 2011); *see id.* (finding irreparable harm in lost

"opportunity to receive a pre-vote topping bid in a process free of taint" of a self-dealing board advisor); *see also*, *e.g.*, Venezuela Parties' Stay Mot. 22 ("'There is no doubt' that a party seeking to prevent a transaction 'faces irreparable injury' absent a stay, where the transaction 'will be practically impossible to rescind.'") (quoting *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1090 (Del. Ch. 2004)). Absent a stay, the transaction that is the subject of the order may close, making the order effectively unreviewable.

In contrast, the requested stay will not harm other parties. As the district court recounted, in connection with Gold Reserve's prior mandamus petition, "the Special Master represented to" this Court that, "[g]iven the numerous steps that must be taken prior to closing, including obtaining regulatory approval in multiple countries, the Special Master expects the transaction will take months to close." (D.I.2553 at 162 n.35.) And, by the terms of the agreement that governs the contemplated transaction, it need not close before June 30, 2026. (*See id.* at 142 (noting this as the "Outside Date" in the governing contract).) A stay pending appeal thus will not interfere with other parties' efforts to prepare to close the transaction if this Court affirms.

Further, as the district court recounted, this case "'essentially require[d]'" that court "'to oversee,'" and this Court to review, "'a Sale Process to sell the nation's fifth-largest petroleum refining company, which is ultimately owned by a

21

foreign sovereign nation that is currently headed by a government not recognized by (but instead sanctioned by) the United States, in order to satisfy'" billions of dollars' worth of judgments. (*Id.* at 112 (quoting D.I.2526 at 25).) The underlying disputes, moreover, have been the subject of "a vast amount of litigation" on which "numerous courts have had occasion to" opine. (*Id.* at 3.) Given the enormous stakes for private parties with interests in the petroleum industry, and for the parties in parallel litigation, a stay pending full review of the district court's judgment is in the public interest. *See, e.g.*, *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 257 (3d Cir. 2011) (affirming issuance of preliminary injunction that would "protect[] the property rights of mineral rights owners").

Moreover, granting a stay now will ensure that the Court is not confronted with emergency motions in the event the Special Master provides notice that Elliott has obtained needed regulatory permissions and is ready to close. Absent a stay, Elliott would be permitted to close within seven days, and the parties inevitably will rush to this Court to forestall that outcome. Given that the parties agree that expedited review is appropriate, this Court can resolve these appeals in time for Elliott to close its transaction before the June 30, 2026 outside date (if the Court affirms). Granting a stay accordingly harms no one's interests and ensures that these disputes can be resolved in an orderly manner.

## CONCLUSION

The Court should stay the district court's order pending appeal.

22

Respectfully submitted,

/s/ *Aaron M. Panner*

MATTHEW H. KIRTLAND
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street NW, Suite 1000
Washington, DC 20001
(202) 662-0200
matthew.kirtland@
nortonrosefulbright.com

AARON M. PANNER
DANIEL S. SEVERSON
COLLIN R. WHITE
DENNIS D. HOWE
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7921
apanner@kellogghansen.com
dseverson@kellogghansen.com
cwhite@kellogghansen.com
dhowe@kellogghansen.com

KEVIN J. MANGAN
MATTHEW P. WARD
STEPHANIE SMIERTKA RILEY
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
(302) 252-4320
kevin.mangan@wbd-us.com
matthew.ward@wbd-us.com
stephanie.riley@wbd-us.com

MICHAEL BOWE
TYLER PURINTON
BRITHEM LLP
565 Fifth Avenue
New York, NY 10017
(646) 653-9173
mbowe@brithem.com
purinton@brithem.com

*Counsel for Appellant Gold Reserve Ltd.*

December 8, 2025

23

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 5,198 words, as certified by the word-count function of the word-processing system (Microsoft Office Word 365) used to prepare the document.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), and 3d Circuit L.A.R. 32.1(c), because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

3.      In addition, pursuant to 3d Circuit L.A.R. 31.1(c), the undersigned hereby certifies that the text of the electronic brief filed with the Court is identical to the paper copies, that a virus detection program (CrowdStrike) has been run on the electronic file, and that no virus was detected.

Dated:  December 8, 2025

/s/ *Aaron M. Panner*
Aaron M. Panner
*Counsel for Appellant*
*Gold Reserve Ltd.*

## CERTIFICATE OF FILING AND SERVICE

I certify that, on December 8, 2025, the foregoing Motion of Appellant Gold Reserve Ltd. for a Stay Pending Appeal was filed electronically with the Clerk of Court and served on counsel of record through CM/ECF.

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to 3d Circuit L.A.R. 28.3(d) and 46.1, I, Aaron M. Panner, hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated: December 8, 2025

/s/ *Aaron M. Panner*

Aaron M. Panner
*Counsel for Appellant*
*Gold Reserve Ltd.*